### Katherine E. Maloney, Appellee, v. North American Union, Appellant.

### Gen. No. 13,958.

1. INSURANCE—*what not warranties.* Answers or alleged answers written into an application by an agent deputed to secure members, inserted long after the signature of the applicant, do not constitute warranties.

2. INSURANCE—*when defense of fraudulent concealment not sustained.* Held, under the evidence in this case, that the defense interposed of "fraudulent evasion and concealment" entirely failed.

3. INSURANCE—*what not warranty against past illnesses.* The following answer: "I * * * have no injury or disease which will tend to shorten life; am now in good health," being in the present tense, is not a warranty against past injuries or diseases.

4. EVIDENCE—*what witness may not be impeached.* A written statement made by a witness is not competent when used by the party who produced such witness if the effect of the production of such written statement is to impeach such witness.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. WILLIAM N. GEMMILL, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed October 8, 1908.

R. E. HAMILTON, for appellant; ROBERT S. ILES, of counsel.

WILLIAM C. ASAY and JEREMIAH B. O'CONNELL, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

The plaintiff in this case recovered in the Municipal

Court of Chicago a judgment of $1,045.76 against the defendant, a fraternal order, of which one Steven A. D. Kellett, the husband of the beneficial plaintiff, had in his lifetime been a member. The judgment was based on the instructed verdict of a jury. From it the defendant appealed to this court, assigning various errors, which in argument resolve themselves into the refusal of the trial judge to admit certain matters offered in evidence by the defendant, and his peremptory instruction to the jury to find for the plaintiff in the sum named.

The certificate of membership of Steven A. D. Kellett in the North American Union was first offered in evidence by the plaintiff. It was issued to him under date of October 24, 1905, and provided:

"That upon condition that the statements made by said member in his application for membership, the representations, statements and agreements, made and subscribed by him in the medical examiner's blank and the answers made and certified by him to the medical examiner, all of which representations, agreements, statements and answers are hereby acknowledged and declared by him to be warranties, be made a part of this contract, and upon condition that the said member complies with all the Laws, Rules and Regulations now governing the said North American Union and the members thereof, and the Mortuary and Reserve Funds thereof, and that may hereinafter be enacted to govern the same, all of which said Laws, Rules and Regulations are also made a part of this contract, and upon said member assenting to and complying with all the conditions herein provided, the North American Union does hereby promise to pay out of its Mortuary Fund to Katherine E. Maloney, related to him as sister, the sum of One Thousand Dollars, in accordance with and under the provisions and the laws governing the said fund, upon satisfactory proofs of the death of said member, and upon the surrender of this certificate, provided that said member is in good standing in this Association at the time of his death, and provided also that this certificate shall not have been

previously surrendered by said member or canceled in accordance with the laws of this Association."

The death of Steven A. D. Kellett on the 25th day of January, 1906, was admitted, and it was also admitted that he died in good financial standing with the company, that his assessments were paid for November and December, 1905, and January, 1906; that the proofs of his death were made in the proper time to the company, and demand therefor was made within three months after his death, and that payment was refused.

The plaintiff then offered in evidence an assignment of the claim on the certificate or policy, as follows: "I hereby assign all right and title in policy No. 22239 issued by the North American Union for $1,000, against the life of Stephen A. D. Kellett, to Mrs. Catherine E. Maloney, his sister, to Mrs. Nellie Kellett, wife of above named Stephen A. D. Kellett, deceased," and rested.

The defendant had pleaded the general issue and also three special pleas, one setting up untrue answers in the application, alleging them to be warranties, and that their falsity and evasion and concealment in other answers avoided the policy; the others are that the policy was obtained by fraud and conspiracy for a person in an unhealthful condition, and was void.

The defense that there was a conspiracy to obtain this insurance was abandoned by the defendant in opening to the jury, and it relied entirely on the position that certain warranted statements in the application by the deceased were untrue, and that the deceased had been guilty of evasion and concealment when being examined for the insurance.

To substantiate this defense the defendant first presented as a witness Dr. Repogle, a physician residing in Chicago, who said that in October, 1905, he was appointed Medical Examiner for the North American Union, and was also deputed to secure members. He

said he pressed the deceased to join and secured his application with difficulty. "I could see," he testified, "that if I didn't push him I would not land him. I says, 'Just sign this paper,' and * * * he signed it on the wall." The paper which was signed was tendered in evidence. It was in four pages. The first page is entitled "Medical Examiner's Blank of the North American Union." With the exception of the applicant's name, birth place, age, etc., it is all in print. The only matters claimed by the defendant to be of importance in this controversy in it, except a clause which warrants the truthfulness of the statements made therein, and consents that any untrue or fraudulent statements or any evasive answers or concealment or suppression of facts by the applicant, whether the same are material or not, shall forfeit and determine the benefits in the benefit certificate which may be issued thereon, are the words:

"I am temperate in my habits and have no injury or disease which will tend to shorten my life, am now in good health and able to gain a livelihood;" and the words:

"I do hereby certify that I have read the foregoing and fully understand the same."

This page was signed by Kellett as applicant and countersigned by Dr. Repogle as Medical Examiner.

The second and third pages are entitled "Applicant's Certificate," and contain 119 printed questions with answers written to most of them in ink. At the end of them are the printed words: "I hereby warrant truthfulness of all the answers to the above questions," and the signature, "Steve A. D. Kellett, applicant."

The fourth page was the "Medical Examiner's Certificate," signed only by him.

On further examination of Doctor Repogle it appeared that the paper was entirely blank except as to the printed matter when it was signed in the two places by Kellett at the instance and urging of the

Doctor, and that it was so signed in both places before the Doctor asked Kellett any questions in regard to his health; also that it was so signed by Kellett on October 19th and the written matter inserted by the Doctor on October 22nd.

Under these circumstances the court admitted the first page in evidence but rejected the 2nd, 3rd and 4th pages. We think this rejection was proper. Illinois Mason's Benevolent Society v. Winthrop, 85 Ill. 537; The Royal Neighbors of America v. Boman, 177 Ill. 27.

It is needless to inquire whether the "answers" were warranties, the inaccuracy of which would avoid the policy, since as a matter of fact they were not "answers" at all, were not signed by the applicant, and were written in by an agent of the defendant "deputed to secure members", long after the signature.

Certain questions, however, were asked by the Doctor of Kellett after the signatures were secured. One of them, and the answer thereto, was testified to by Dr. Repogle as follows:

"Q. Now what questions did you ask him in regard to his health and his previous past condition?

A. I asked him whether he ever had any serious illness or injury, after I got through examining him physically.

Q. What did he say?

A. He pointed to a scar on his head and replied that he had been stabbed. I don't know whether he said he was stabbed or cut or shot, but stabbed or shot. He said he was shot or stabbed, one of the two, up here (indicating), just a scalp wound, took a couple of stitches or something like that, and I found it wasn't of any serious consequence in my examination.

Q. What, if anything, did he say about his health?

A. He did not reply except in that way."

We are unable to see that, assuming that Kellett had had a serious illness—as the evidence afterward tended to prove—this answer, relied on by the defendant to show "a fraudulent evasion or concealment"

which would avoid the policy, had any such tendency, or should have gone to the jury on the theory that they should be allowed to judge whether or not it did.

It was not a refusal to answer; it was the pointing out of one "injury," and not a "concealment or evasion" as to others. The medical man—who was the agent of the Society—should have inquired further if he desired to know. A reason for his not doing so perhaps can be gathered from his testimony, in which he says:

"I told him to take off his coat * * * He removed his coat and I took his measurement around the waist—inspiration; * * * took his vest off; took his pulse; examined his heart with a stethescope. He was a well developed man; he looked like a good risk—better than any of you fellows here. I examined his heart carefully. While I was examining him he made the remark, 'I have been an athlete for some club down town,' and he looked like an athlete, and I examined his heart then more carefully, because athletes usually have a weak heart; sometimes they do. * * * I found nothing the matter with his heart at all; he had good expansion, lungs were good; *in fact he looked so good that * * * I got through with the examination very quickly without asking many questions, because I took it for granted he was all right.* I had a bottle with me and after I got through I asked him to fill it for me. I mean for specimens of urine. When I examined him his shirt was up. I examined his naked skin. * * * He didn't have a pimple on him or anything."

Irrespective, therefore, of whether or not the proof showed that the insured had, prior to this examination, a "serious illness or injury," this attempt to show "fraudulent evasion and concealment"—an affirmative defense—entirely failed and should not have prevented, as it did not, an instruction that there was no defense to the action.

The first page of the "Medical Examiner's Blank,"

however (which first page was received in evidence), contained the statement, signed by the applicant, "I * * * have no injury or disease which will tend to shorten life; am now in good health," etc. This statement is warranted by the terms of the application, and the applicant signed the same and a certificate that he had read and fully understood the same.

We shall assume, without reference to the circumstances under which he signed this, that the statement was a warranty and that the deceased was bound by it. But with some hesitation we have come to the opinion that there was neither any evidence offered and received nor—when taken in connection with the proven and admitted facts—any offered and excluded, which would have proven the falsity of this statement.

It was in the present tense; it was a statement of his present condition. To show its falsity the defendant introduced the testimony of Dr. McCandless, who testified that in 1903, two years, that is, before the application, he had treated the deceased for syphilis during six months. But McCandless also testified in his direct examination, in answer to the interrogatories of the plaintiff's counsel, as follows:

"Q. You may state whether or not syphilis is a disease that would tend to shorten the life of a person that was afflicted with it to the same degree that this patient was at the time you treated him in 1903. A. I firmly believe that it positively will not if properly treated.

Q. You may state whether or not you had discharged this patient as cured? A. I certainly believed he was cured. I saw him continuously; he was a neighbor of mine."

He also testified in cross-examination as follows:

"Q. Do you now ever recall having told Mr. Kellett that you believed he had syphilis? A. No, I don't remember that.

Q. As a matter of fact, your recollection is that you did not tell him—is that correct?

A. I don't remember ever telling him."

The real and doubtful question in this case is whether in consideration of this testimony by the defendant's own witness, who was the medical attendant of the deceased, by whom alone the defendant proved that he had had syphilis, the defendant should have been allowed to introduce further testimony of experts under the following offers:

"We offer to prove by medical experts that the symptoms as given by Dr. McCandless of this patient in his last illness, together with the history of his case in 1903 as treated and testified to by Dr. McCandless, shows that the cause of his death was the result of syphilis or that his death was caused by syphilis."

"Plaintiff's Counsel: To which the plaintiff objects.

The Court: Objection sustained.

Defendant's Counsel: Exception."

Again—"Defendant's Counsel: I further offer to prove by physicians that paresis and syphilis, or either of them, are diseases that tend to shorten the life and that syphilis and paresis are both incurable diseases.

Plaintiff's Counsel: To which we object.

The Court: Objection sustained.

Defendant's Counsel: Exception."

The allusion to paresis in this offer is explained by this situation: The defendant had proved by an interne in St. Luke's Hospital, named Clark, that in October, 1904, Kellett had been admitted to said hospital and had remained there for at least twenty days; that he had been admitted as suffering from varicocele, that is a varicose condition of the veins of the scrotum. This is all that was proven, but the defendant, when Clark was on the stand, had offered a paper, which Dr. Clark said was a card from a card index kept by the hospital as a record of the admission and dismissal of patients. The witness did not know who wrote it, but said it was one of the records kept by the hospital. It was not admitted nor otherwise iden-

tified, but it is inserted in the record, and on it appears, among other data which give the description of the person, the words "Admitting diagnosis,—Varicocele." There is also on this card, or on some other document also offered in evidence under the same conditions, but not admitted (the record is obscure on this point), a "consent" to any operation which the operating surgeon at the hospital might think necessary, and after this, this memorandum:

"Date Discharged. Condition.      . Diagnosis.
    Nov. 5, 1904.     Cured.     General Paresis. Left
                                                      Varicocele."

This allusion to "paresis" is, so far as we find, the only one in the record, except as it appears in the offer noted above and in this further offer by defendant's counsel:

"We offer to prove that this Stephen A. D. Kellett was treated in St. Luke's Hospital from October 8, 1904, until November 5, 1904; that he was operated on for varicocele during said period, and that his case was diagnosed and he was treated for paresis, and that on October 12, 1904, he signed a written consent to an operation in the hospital."

This offer was also refused by the court.

As further showing the situation at the time these offers were made, it may be noted that Dr. McCandless testified that Kellett died "from convulsions due to traumatic or mechanical injury to the brain," and that "he had fallen from a chair and had an abrasion on his temple on the side of his head where it had evidently struck some hard object or pointed object."

The counsel for defendant asked the Doctor, without objection, "Did you get any history of his case that led you to make that diagnosis?" and received in response, without objection, the following answer:

"Yes, I received information of a member of the family of his having had a severe beating while in the employ of the Telephone Company."

When this beating occurred, if it did occur, does not appear.

The hospital "admission card" was plainly incompetent.

It is to be noted that the offers were exceedingly general. No specific witness was offered and no specific questions were asked, and the effect of the general testimony as to the curability of syphilis suggested would have been directly to contradict the witness as to this particular case, which the defendant had itself offered. We think that the court, under the record as it then existed, did not commit reversible error in refusing on the general offer, without individualization, to enter on a war of expert testimony on the scientific question of the curability or incurability of syphilis.

As to the "paresis," there was no foundation laid for the offer. The course adopted, if there was ability to prove it, was not the correct one. A witness should have been produced who knew the alleged fact offered to be proven, and a question asked him.

A death certificate signed by Dr. McCandless and on file in the Bureau of Vital Statistics in the Department of Health of Chicago, and certified by the Registrar of the Bureau, was offered by the defendant, and refused by the Court. It was marked for identification and appears in the record. It states the "Cause of death" as "Convulsions due to Brain Tumor," and the "Duration of Disease" as "3 years."

Whether or not this would have been competent to prove the cause of death and other matters contained in it, if Dr. McCandless had not been placed on the stand himself by the defendant, it is needless to inquire. It was not competent as offered by defendant to impeach its own witness, or to supply, by wholly unsifted statement, what he could have been and indeed was examined and cross-examined on in open court.

If these various rulings of the court were right in

rejecting offered evidence, then it follows that there was no error in instructing the jury to find for the plaintiff to the amount of the certificate and interest. By the evidence which was admitted it was plain that the defendant did not sustain the affirmative defense it had taken upon itself to make. The *prima facie* case made by the plaintiff was left untouched and the verdict and judgment necessarily followed.

The judgment of the Municipal Court is therefore affirmed.

*Affirmed.*